## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AURELIO DUCLERC,        )<br>    )<br>**Plaintiff,**   )<br>    )<br>v.     )<br>    )<br>**MASSACHUSETTS DEPARTMENT OF**  )<br>**CORRECTION, JAMES R. BENDER,**  )<br>**PETER R. ST. AMAND, and**  )<br>**PETER A. PEPE, JR.,**  )<br>    )<br>**Defendants.**   )<br>    )<br>    ) | **Civil Action No. 10-12050-DJC** |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                    December 18, 2012

### I.    Introduction

Plaintiff Aurelio Duclerc ("Duclerc") has brought this action challenging his confinement in the Departmental Disciplinary Unit ("DDU") at the Massachusetts Correctional Institution at Cedar Junction ("MCI-Cedar Junction").  Duclerc, a sentenced inmate at the time he filed this lawsuit, alleges that his placement in the DDU, to serve a disciplinary confinement sentence incurred when he was previously incarcerated, violated his federal and state substantive due process (Counts I and II) and procedural due process (Counts III and IV) rights, as well as Mass. Gen. L. c. 127, § 20 and 130 C.M.R. § 420.08.  Duclerc asserts his claims against former Deputy Commissioner of the Department of Correction's Prison Division, James R. Bender ("Bender") and former Superintendants of MCI-Cedar Junction, Peter R. St. Amand ("St. Amand") and Peter A. Pepe, Jr. ("Pepe") (collectively, the "DOC Defendants"), in their official and individual

capacities.[1]  For the reasons set forth below, the Court GRANTS the DOC Defendants' motion

for summary judgment and DENIES Duclerc's motion for partial summary judgment.

## II.    Burden of Proof and Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the undisputed facts show that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  The moving party must show the basis for its motion and demonstrate the

absence of a genuine dispute of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986). The movant must also support its factual positions by "citing to particular parts of

materials in the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other

materials."  Fed. R. Civ. P. 56(c)(1)(A); see Celotex Corp., 477 U.S. at 323.  "[A] fact is

'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the

parties' positions on the issue are supported by conflicting evidence." Int'l Ass'n of Machinists

& Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199–200 (1st Cir. 1996)

(internal citation omitted).  The nonmovant "must point to 'competent evidence' and 'specific

facts' to stave off summary judgment." Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's

of London, 637 F.3d 53, 56 (1st Cir. 2011) (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d

313, 315 (1st Cir. 1995)); ATC Realty, LLC v. Town of Kingston, N.H., 303 F.3d 91, 94 (1st

Cir. 2002).  When "presented with cross-motions for summary judgment, [the Court] 'must view

each motion separately,' in the light most favorable to the non-moving party, and draw all

reasonable inferences in that party's favor." OneBeacon Am. Ins. Co. v. Commercial Union

---

[1] Duclerc does not oppose the dismissal of the Massachusetts Department of Correction as a defendant in this case.  Pl. Opp., D. 41 at 4 n.1.

Assurance Co. of Can., 684 F.3d 237, 241 (1st Cir. 2012) (quoting Estate of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010)).

## III.   Factual Background

The following facts are undisputed unless otherwise noted.

### A.   The Parties

When Duclerc filed this action, he was an inmate in the custody of the Massachusetts Department of Correction (the "DOC") at MCI-Cedar Junction in Walpole, Massachusetts and had been confined in the DDU there.  Compl., D. 28 ¶¶ 1, 9; Defs. Ans., D. 27 ¶¶ 1, 9.  The DOC is a Massachusetts government agency within the Executive Office of Public Safety and Security.  Compl., D. 28 ¶ 2; Defs. Ans., D. 27 ¶ 2.  Bender was, at all times relevant to this action, the Deputy Commissioner of the DOC's Prison Division, and responsible for all day-to-day operations and policy development for the DOC's correctional facilities.  Pl. SOF, D. 34-2 ¶ 3; Defs. Resp. to Pl. SOF, D. 43 ¶ 3.  These responsibilities included the security aspects of the prisons and oversight of the Inmate Disciplinary Unit, Central Transportation Unit and the Office of Investigative Services.  Pl. SOF, D. 34-2 ¶ 3; Defs. Resp. to Pl. SOF, D. 43 ¶ 3.  Bender retired from the DOC on January 6, 2011.  Defs. SOF, D. 35 ¶ 2; Pl. Resp. to Defs. SOF, D. 41-1 ¶ 2.  St. Amand was previously the Superintendant of MCI-Cedar Junction and retired from the DOC on December 24, 2010.  Defs. SOF, D. 35 ¶ 3; Pl. Resp. to Defs. SOF, D. 41-1 ¶ 3.  Pepe was previously the Superintendant of MCI-Cedar Junction and is currently the Deputy Commissioner of the Prison Division.  Defs. SOF, D. 35 ¶ 4; Pl. Resp. to Defs. SOF, D. 41-1 ¶ 4.

### B.   Terms of Confinement in the DDU

The DDU is a maximum-security housing unit located on the grounds of MCI-Cedar Junction.  Bender Dep., D. 35-4 at 52:22–53:1.  While in the DDU, inmates are held for up to 23 hours a day in a cell.  Bender Dep., D. 34-3 at 86:15–16.  DDU inmates must eat their meals in their cells.  Compl., D. 28 ¶ 15; Defs. Ans., D. 27 ¶ 15; DDU Manual, D. 35-5 at 5. [2]  In addition, they are allowed no more than one hour of exercise per day, five days a week, which takes place outside their cells in a fenced-in area.  Bender Dep., D. 34-3 at 86:17–22; DDU Manual, D. 35-5 at 17.  DDU inmates have the opportunity to shave and shower three times per week and may receive a haircut every 60 days.  DDU Manual, D. 35-5 at 16.  When a DDU inmate leaves his cell, he must submit to a full strip search and be placed in handcuffs and shackles.  Compl. D. 28 ¶ 18; Defs. Ans., D. 27 ¶ 18; DDU Manual, D. 35-5 at 7.  An inmate's ability to earn good-time credit in the DDU is also restricted.  Bender Dep., D. 34-3 at 97:11–14.

### C.   Duclerc's First Commitment Period in the DDU

On November 24, 2004, Duclerc entered DOC custody in the general population of Massachusetts Correctional Institution at Concord.  W84559 Bed History Report, D. 35-6 at 2.  On February 11, 2005, Duclerc entered the general population at MCI-Cedar Junction and was housed in various general population units, with limited interruption, until December 25, 2007.

---

[2] The DOC Defendants cite to the DDU Inmate Orientation Manual regarding conditions in the DDU.  See Defs. SOF, D. 35 ¶ 7 (stating that "the conditions of confinement in [the] DDU are described in the DDU Inmate Orientation Manual or DDU Handbook").  Duclerc disputes those facts on the basis that the DOC Defendants "cite no admissible evidence" that Duclerc experienced such conditions.  See, e.g., Pl. Resp. to Defs. SOF, D. 41-1 ¶ 14 (noting that the "[DOC] Defendants cite no admissible evidence regarding application of the exercise privilege to the case at bar").  However, Duclerc offers no evidence contradicting the DOC Defendants' facts regarding the conditions in the DDU and a party opposing a summary judgment motion "cannot survive post-discovery summary judgment by mere denials, but must set forth facts from which factfinder might draw contrary inference."  Blanchard v. Peerless Ins. Co., 958 F.2d 483, 490 (1st Cir. 1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986)).  Moreover, the Court also notes that these facts were not material to its ruling in this matter.

Id. at 1–2.   On December 25, 2007, Duclerc was accused of stabbing another inmate, DDU Hearing Package, D. 35-7 at 9; Defs. Disclosures, D. 34-3 at 57, and was assigned to a Special Management Unit ("SMU") the next day.  W84559 Bed History Report, D. 35-6 at 1.

On February 4, 2008, Duclerc received a Disciplinary Report for this incident that was referred for a DDU hearing.  Compl., D. 28 ¶ 10; Defs. Ans., D. 27 ¶ 10; DDU Hearing Package, D. 35-7 at 3–4.   On April 8, 2008, in accordance with the DOC's regulation on inmate discipline, 103 C.M.R. § 430, a disciplinary hearing was held on the charge against Duclerc and the hearing officer found Duclerc guilty of the allegations in the Disciplinary Report and sentenced Duclerc to 30 months in the DDU, with 28 months to serve.  Bender Resp. to Interrog. Number 6, D. 34-3.  Duclerc was present at the hearing and issued a statement in his defense.  DDU Hearing Package, D. 35-7 at 12.

Duclerc was moved to the DDU on April 29, 2008, where he remained, with limited interruption, until the completion of his underlying criminal sentence at the time on October 28, 2008.  W84559 Bed History Report, D. 35-6 at 1.  Upon this release, Duclerc had served only approximately six months of his 30-month DDU sentence.  See id.

### D. Duclerc's Return to the DDU

While on release, Duclerc committed another offense, pled guilty to assault with a deadly weapon and was sentenced to another period of incarceration.  Duclerc Dep., D. 35-2 at 165:5–9. Duclerc reentered the general population at MCI-Cedar Junction on October 29, 2009, but was not initially classified in accordance with 103 C.M.R § 420.  W95347 Bed History Report, D. 35-9 at 2; Pl. SOF, D. 34-2 ¶ 24; Defs. Resp. to Pl. SOF, D. 43 ¶ 24.  On November 10, 2009, Duclerc was placed in a SMU.  W95347 Bed History Report, D. 35-9 at 2.  On December 2,

2009, Duclerc was moved to the DDU pursuant to an order from Bender.  Id.; Bender Dep., D. 35-4 at 127:17–128:1, D. 34-3 at 118:5–11.  There has never been a DOC policy addressing returning a convicted inmate to the DDU to complete a sanction imposed during a previous period of incarceration, but it was the DOC's "informal practice" to do so.  Pl. SOF, D. 34-2 ¶ 43; Defs. Resp. to Pl. SOF, D. 43 ¶ 43; Bender Dep., D. 34-3 at 119:8–17.

On December 3, 2009, Duclerc contested his DDU placement for "offenses that occurred during a different prison bid, and after [he'd] been released [and] freed to the streets."  Defs. Disclosures, D. 34-3 at 57; Pl. SOF, D. 34-2 ¶ 32; Defs. Resp. to Pl. SOF, D. 43 ¶ 32.  Specifically, he requested that his DDU privileges be reinstated to the status when he left the DOC's custody in October 2008 and they were reinstated a week and a half after he returned to the DDU.  Defs. Disclosures, D. 34-3 at 57; Duclerc Dep., D. 35-2 at 174:7–175:6.  A few days later, on December 7, 2009, Bender informed Duclerc via letter that he was "returned to DDU to complete the DDU sanction associated with D-report No. 125654," which was incurred while he was serving his previous sentence.  D. 35-10.  Duclerc was not afforded a new hearing in connection with his return to the DDU.  See id.  On April 5, 2010, Duclerc filed a grievance in which he complained that he was returned to the DDU while serving a new sentence and requested to be placed in the general population.  Grievance #46200, D. 35-11 at 2.  The DOC denied the grievance because Duclerc was "returned to the DDU to complete the DDU sanction [previously imposed]."  Id. at 3.  On April 17, 2010, Duclerc appealed that denial to Pepe, the Superintendant of MCI-Cedar Junction.  Compl., D. 28 ¶ 30; Defs. Ans., D. 27 ¶ 30.  On April 23, 2010, Pepe affirmed the decision and said that "[t]he decision to return you to DDU was

made by Deputy Commissioner James Bender and is consistent with departmental policy." Compl., D. 28 ¶ 32, 35; Defs. Ans., D. 27 ¶¶ 32, 35.

Duclerc received a classification hearing on January 14, 2011 and the resulting classification was deemed an "initial" classification, although it occurred approximately 14 months after the beginning of his second period of incarceration. Pl. SOF, D. 34-2 ¶¶ 25, 26; Defs. Resp. to Pl. SOF, D. 43 ¶¶ 25, 26. Duclerc remained in the DDU, with limited interruption, until February 3, 2011, when he was released into the general population at Souza-Baranowski Correctional. W95347 Bed History Report, D. 35-9 at 2. Duclerc spent 428 days, or roughly 14 months, in the DDU. See id. Duclerc was released from the DDU because of an adverse decision in which the district court held that Bender violated the procedural due process rights of a pretrial detainee (and later convicted felon) when he was confined, without a new hearing, to the DDU during a second period of incarceration to serve the remainder of a DDU sanction that was imposed during a prior period of incarceration. Ford v. Clarke, 746 F. Supp. 2d 273, 294 (D. Mass. 2010); Bender Resp. to Interrog. Number 1, D. 35-12 at 3.

On April 6, 2012, Duclerc completed his criminal sentence and was released from DOC custody. W95347 Bed History Report, D. 35-9 at 1.

## IV.    Procedural History

Duclerc initiated this lawsuit on November 18, 2010 and filed an amended complaint on May 24, 2011 asserting claims of deprivation of substantive due process under the Fourteenth Amendment of the United States Constitution (Count I) and Articles 1, 10 and 12 of the Massachusetts Declaration of Rights (Count II); deprivation of procedural due process under the Fourteenth Amendment of the United States Constitution (Count III) and Articles 1, 10 and 12 of

the Massachusetts Declaration of Rights (Count IV); and violation of Mass. Gen. L. c. 127, § 20 and 130 C.M.R. § 420.08 (Count V).  Compl., D. 28.  The DOC Defendants have moved for summary judgment on all claims.  Defs. Mot., D. 33.  Duclerc has moved for partial summary judgment against Bender, in his individual and official capacities, on Counts I, III and V.  Pl. Mot., D. 34.  Duclerc has also filed a motion to strike documents contained in Duclerc's DDU hearing file that the DOC Defendants offered as exhibits in support of their motion for summary judgment.  Pl. Mot. to Strike, D. 42.  During a hearing on the motions on November 20, 2012, the Court denied the motion to strike and took the summary judgment motions under advisement.

## VI.   Discussion

### A.   Official Capacity Claims

Duclerc brings this action against the DOC Defendants in both their individual and official capacities and is seeking declaratory relief and monetary damages.  Pl. Opp., D. 41 at 4 n.2.  The "performance of official duties creates two potential liabilities, individual-capacity liability for the person and official-capacity liability for the [state]."  Guillemard-Ginorio v. Contreras-Gomez, 585 F.3d 508, 531 (1st Cir. 2009) (alteration in original) (quoting New Orleans Towing Ass'n v. Foster, 248 F. 3d 1143 (5th Cir. 2001)).  Duclerc brings his federal constitutional claims (Counts I and III) against the DOC Defendants pursuant to 42 U.S.C. § 1983.  Compl., D. 28 ¶¶ 48, 53.  However, "it is well settled 'that neither a state agency nor a state official acting in his official capacity may be sued for damages in a section 1983 action.'" Wang v. N.H. Bd. of Registration in Med., 55 F.3d 698, 700 (1st Cir. 1995) (quoting Johnson v. Rodriguez, 943 F. 2d 104, 108 (1st Cir. 1991)).  Duclerc also brings state law claims against the DOC Defendants (Counts II, IV and V).  Compl., D. 28 ¶¶ 51, 55, 60.  However, in an official-

capacity suit, "the Supreme Court has held that the Eleventh Amendment bars state law claims against state officials for . . . monetary relief." Guillemard-Ginorio, 585 F.3d at 531 (quoting Foster, 248 F. 3d at 1143). The Eleventh Amendment is inapplicable to personal-capacity suits, since such are not suits against the state for the purposes of the Eleventh Amendment, "regardless of whether the claims alleged against the individual officer are grounded in state or federal law." Id. Accordingly, to the extent Duclerc is pursuing claims against the DOC Defendants in their official capacities, the DOC Defendants' motion for summary judgment on those claims for money damages is granted.

### B.    Mootness of Claims for Declaratory Judgment

The DOC Defendants argue that Duclerc's claims for declaratory relief became moot when Duclerc was moved from the DDU to the general population in February 2011 or when he was released from the DOC's custody in April 2012. Defs. Mem., D. 36 at 30. The Declaratory Judgment Act[3] provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "[T]he phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007). The case-or-controversy requirement "must be satisfied at each and every stage of the litigation." Cruz v. Farquharson,

---

[3] Although Duclerc's complaint cites the Massachusetts Declaratory Judgment Act, Mass. Gen. L. c. 231A, "[w]here, as here, a federal court proceeds under supplemental jurisdiction, it is obliged to apply federal procedural law and state substantive law." Perry v. Blum, 629 F.3d 1, 8 (1st Cir. 2010). The state and federal declaratory judgment acts are procedural. Tocci Bldg. Corp. of N.J., Inc. v. Va. Sur. Co., 750 F. Supp. 2d 316, 320 n.2 (D. Mass. 2010). Accordingly, the Court considers Duclerc's declaratory judgment claims under the federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.

252 F.3d 530, 533 (1st Cir. 2001).  "When 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur,' there is no live controversy to review," and the case is moot.  Camreta v. Greene, — U.S. —, 131 S. Ct. 2020, 2034 (2011) (quoting United States v. Concentrated Phosphate Export Assn., Inc., 393 U.S. 199, 203 (1968)).[4]

Duclerc asserts, however, that his claims for declaratory relief are not moot because they are "capable of repetition, yet evading review."  See Weinstein v. Bradford, 423 U.S. 147, 148–49 (1975) (internal citation omitted).  For this doctrine to apply, "(1) the challenged action was in its duration too short in duration to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again."  Id. at 149.  Duclerc argues that there is a reasonable expectation that he will again be returned to the DDU without a further hearing because "he has spent a significant portion of his adult life in prison," and thus "at least some possibility exists that [he] will find himself in Department custody in the future."  Pl. Opp., D. 41 at 15–16.  That argument is foreclosed, however, by the Supreme Court's decision in City of Los Angeles v. Lyons, 461 U.S. 95 (1983).[5]  There, the Court held that a man who had been subjected to a chokehold by the

---

[4] The DOC Defendants do not contend that Duclerc's claims for money damages are moot; nor could they, given that a claim for damages stemming from past conduct necessarily survives the end of the conduct giving rise to the claim.  See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dept. of Health & Human Res., 532 U.S. 598, 609 (2001); see also Goodwin v. C.N.J., Inc., 436 F.3d 44, 49 (1st Cir. 2006) (noting that "[a] finding of mootness with respect to a prayer for injunctive relief does not automatically render a companion claim for monetary damages moot").

[5] The Lyons Court was discussing whether there was a live case or controversy for standing purposes, but the inquiry is the same for mootness purposes; "the doctrine of mootness can be described as the doctrine of standing set in a time frame:  The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."  Becker v. Fed. Election Comm'n, 230 F.3d 381, 386 n.3 (1st Cir. 2000)

police during a traffic stop had failed to show a live controversy in his suit for an injunction barring the police from doing the same thing to him again.  See id. at 105 (explaining "[t]hat Lyons may have been illegally choked by the police on October 6, 1976 . . . does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part").  In so holding, the Court explained that "[i]t was to be assumed that [plaintiffs] will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct."  Id. at 103 (second alteration in original) (quoting O'Shea v. Littleton, 414 U.S. 488, 497 (1974)) (internal quotation mark omitted).  Under that reasoning, the mere possibility that Duclerc might, at some point in the future, commit another crime, be arrested and be returned to DOC custody is insufficient to give rise to a live controversy as to his placement in the DDU that can sustain a declaratory judgment.  Accordingly, since Duclerc neither remains incarcerated nor in the DDU, and the possibility of his future incarceration is too speculative to constitute a case of actual controversy, the claim for declaratory judgment is moot and the Court GRANTS the DOC Defendants' motion for summary judgment as to this claim.

### C.    **Qualified Immunity**

The parties have moved for summary judgment on Duclerc's claims that his confinement in the DDU during his second period of incarceration pursuant to an outstanding DDU sanction acquired during a previous period of incarceration and without a new hearing deprived him of his right to substantive and procedural due process.  Specifically, Duclerc is seeking summary judgment on his claims, set forth in Counts I and III of the Complaint, that Bender violated his

(quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000)) (internal quotation marks omitted).

Fourteenth Amendment right to substantive and procedural due process.  Pl. Mem., D. 34-1 at 13–18.  The DOC Defendants are seeking summary judgment on those claims as to all of the defendants, as well as on Counts II and IV of the Complaint in which Duclerc claims that his substantive and procedural due process rights under Articles 1, 10 and 12 of the Massachusetts Declaration of Rights have been violated.  Defs. Mem., D. 36 at 3–18.

The DOC Defendants contend that even if they violated Duclerc's federal and state constitutional rights, they are entitled to qualified immunity.  Id. at 20–23.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).[6]  In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving whether a government official was entitled to qualified immunity.  First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right.  Saucier, 533 U.S. at 201.  Second, if the first step has been met, the court must decide whether that right was "clearly established" at the time of the defendant's alleged misconduct.  Id.  However, the Supreme Court has since held that, to determine whether officials are entitled to qualified immunity, courts need not first decide whether the facts that a plaintiff has shown make out a constitutional violation.  Pearson, 555 U.S. at 236 (holding that the sequence set forth in Saucier "should no longer be regarded as mandatory").  Furthermore, "[i]t is bedrock that the 'long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the

---

[6] Massachusetts law follows federal qualified immunity standards.  Ahmad v. Dep't of Corr., 446 Mass. 479, 484 (2006) (noting that "[t]he doctrine of qualified immunity shields government officials, performing discretionary tasks, from liability for civil damages under both Federal and State law"); Duarte v. Healy, 405 Mass. 43, 47–48 (1989).

necessity of deciding them.'" <u>Sony BMG Music Entm't v. Tenenbaum</u>, 660 F.3d 487, 511 (1st Cir. 2011) (quoting <u>Lyng v. Nw. Indian Cemetery Protective Ass'n</u>, 485 U.S. 439, 445 (1988)). Therefore, in this case, the Court does not reach whether Duclerc's federal and state constitutional claims have merit. <u>See</u> <u>Camreta</u>, 131 S. Ct. at 2031 (noting the rule that courts must avoid resolving constitutional questions unnecessarily and explaining that in qualified immunity cases, "a court can enter judgment without ever ruling on the (perhaps difficult) constitutional claim the plaintiff has raised"). [7]

To determine whether the DOC Defendants are entitled to qualified immunity, the Court must decide whether their conduct violated a "clearly established constitutional right." <u>Pearson</u>, 555 U.S. at 232. "Clearly established" for purposes of qualified immunity means that the contours of the right are "sufficiently clear" that "every 'reasonable official would have understood that what he is doing violates that right.'" <u>Ashcroft v. al-Kidd</u>, — U.S. —, 131 S. Ct. 2074, 2083 (2011) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)). For a right to be clearly established, there does not need to be a "case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." <u>Id.</u> "The court must examine whether there are 'cases of controlling authority . . . at the time of the incident . . . [or] a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'" <u>Barton v. Clancy</u>, 632 F.3d 9, 22 (1st Cir. 2011) (alterations and omissions in original) (quoting <u>Bergeron v. Cabral</u>, 560 F.3d 1, 11 (1st Cir. 2009)) (internal quotation marks omitted).

---

[7] The Supreme Court has "detailed a range of circumstances in which courts should address only the immunity question." <u>Camreta</u>, 131 S. Ct. at 2032. One such circumstance is when "it appears that the question will soon be decided by a higher court," such as when a "district court encounters a constitutional question that is before the court of appeals." <u>Pearson</u>, 555 U.S. at 238. Such is the case here where the defendants here have appealed the adverse decision against them in <u>Ford</u>. <u>Ford v. Bender</u>, No. 12-1622 (1st Cir. docketed May 22, 2012).

1.      *Substantive Due Process*

"The substantive component of due process protects against 'certain government actions regardless of the fairness of the procedures used to implement them.'" <u>Souza v. Pina</u>, 53 F.3d 423, 425 (1st Cir. 1995) (quoting <u>Daniels v. Williams</u>, 474 U.S. 327, 331 (1986)).[8]  "Thus, unlike a procedural due process claim, this challenge requires [the Court] to assess the constitutionality of the deprivation itself." <u>Gonzalez-Fuentes v. Molina</u>, 607 F.3d 864, 880 (1st Cir. 2010).  Where an executive action has been challenged, "the threshold question is 'whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  <u>Id.</u> (quoting <u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. 833, 847 n.8 (1998)).

The First Circuit has noted that the "shock the conscience" test "has been labeled 'admittedly imprecise.'"  <u>Id.</u> (quoting <u>Hawkins v. Freeman</u>, 195 F.3d 732, 741 (4th Cir. 1999)). Nevertheless, the First Circuit has explained that:

> [a] hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with 'violations of personal rights . . . so severe . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.

<u>Id.</u> at 881 (quoting <u>Moran v. Clarke</u>, 296 F.3d 638, 647 (8th Cir. 2002)) (omissions in original). Further, even executive action that shocks the conscience will not infringe substantive due process rights unless it also deprives a person of an interest that is one of the "fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if

---

[8] Duclerc does not dispute that the same standards govern the federal and state constitutional claims.

14

they were sacrificed.'"  Washington v. Glucksberg, 521 U.S. 702, 720–21 (2007) (internal citations omitted).

The parties have not directed the Court to any authority holding that restoring a sentenced inmate to disciplinary confinement in circumstances similar to those at issue here is so egregious that it shocks the conscience.  Nor does it appear that any court has held that a convicted prisoner's interest in avoiding such disciplinary confinement is a freedom equivalent to those rights fundamental to ordered liberty.  Cf. id. at 727 n.19 (listing such freedoms as the rights to marry, to direct the upbringing of one's children, to marital privacy, to contraception and to abortion).  Accordingly, the substantive due process right that Duclerc advocates here was not clearly established, and reasonable officials in the DOC Defendants' position would not have known that their conduct was unconstitutional.  Thus, they are entitled to qualified immunity on Duclerc's substantive due process claims.

### 2.   Procedural Due Process

An inmate is entitled to the protection of procedural due process under the United States Constitution only if there is an existing liberty interest at stake.  Sandin v. Conner, 515 U.S. 472, 484 (1995); see also Wilkinson, 545 U.S. at 221 (noting that "those who seek to invoke [the Fourteenth Amendment's] procedural protection must establish that one of these interests [in life, liberty, or property] is at stake").  A liberty interest in avoiding particular conditions of confinement may arise where the challenged conditions impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Wilkinson, 545 U.S. at 222–23 (quoting Sandin, 515 U.S. at 484) (internal quotation marks omitted).  Only after a court determines whether the inmate has been deprived of a protected interest does it consider

whether that deprivation was accomplished without due process of law. Perez–Acevedo v. Rivero–Cubano, 520 F.3d 26, 30 (1st Cir. 2008); Childers v. Maloney, 247 F. Supp. 2d 32, 36 (D. Mass. 2003). Where an inmate has been deprived of such an interest, the disciplinary proceedings must satisfy the minimum procedural safeguards required set forth in Wolff v. McDonnell, 418 U.S. 539 (1974). See id. at 564–66 (requiring that (1) written notice of the charges be given to the inmate at least 24 hours before the hearing; (2) the inmate have an opportunity to appear at the hearing, call witnesses and present rebuttal evidence; and (3) there be a written statement by the factfinders as to the evidence relied on for their decision and the reasons for the disciplinary action).

Duclerc argues that the DOC Defendants are not entitled to qualified immunity on his procedural due process claims because the "constitutional right to procedural due process at a meaningful time was well established in 2009." Pl. Opp., D. 41 at 10. However, Duclerc articulates the right at issue at far too high a level of generality. See al-Kidd, 131 S. Ct. at 2084 (noting that the Supreme Court has "repeatedly told courts [in the context of qualified immunity inquiries] not to define clearly established law at a high level of generality"); see also Creighton, 483 U.S. at 639 (explaining that "the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. . . . But if the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of Harlow"). "It is not enough for the constitutional right to be 'clearly established' at a highly abstract level; what matters is whether in the circumstances faced by the official, he

should reasonably have understood that his conduct violated clearly established law." <u>Ringuette v. City of Fall River</u>, 146 F.3d 1, 5 (1st Cir. 1998).

Thus, in this case, the appropriate question is whether, in 2009, when Duclerc was placed in the DDU during his second period of incarceration, a reasonable official should have known that an inmate had a clearly established procedural due process right to a new hearing before being placed back in disciplinary confinement during a second period of incarceration to continue serving a disciplinary sanction imposed during a previous period of incarceration.  At the time of the challenged conduct, it was established that "punishment of incarcerated prisoners . . . does not impose retribution in lieu of a valid conviction," but rather "effectuates prison management and prisoner rehabilitative goals." <u>Sandin</u>, 515 U.S. at 485.  It was also established that a disciplinary sanction, such as confinement to the DDU, is separate and apart from a criminal sanction and thus, "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." <u>Id.</u> The Massachusetts Appeals Court has held that because a disciplinary sanction is "independent and distinct from the imposition of punishment reflected in sentences of incarceration imposed following convictions for criminal offenses," it could extend beyond the original criminal sentence and continue through a consecutive sentence. <u>In re Pridgett</u>, 57 Mass. App. Ct. 1114 (2003).  Furthermore, the Supreme Judicial Court had held that the disciplinary proceedings provided to inmates facing a DDU sanction satisfies the due process requirements mandated by the Supreme Court. <u>Torres v. Comm'r of Corr.</u>, 427 Mass. 611, 618–19 (1998) (holding that the "DDU's disciplinary process comports with the requirements of the Fourteenth Amendment, as set forth in <u>Wolff</u>").  There was no binding decision that reasonably could have lead the DOC

Defendants to understand that returning Duclerc, a convicted inmate, to the DDU without a second hearing was a violation of due process; in fact, there was case law to suggest that the opposite was correct and no further procedural protections beyond those accorded before the initial confinement were legally required. [9]   Accordingly, there was no "existing precedent" at the time Duclerc was returned to the DDU that "placed [this] constitutional question beyond debate." al-Kidd, 131 S. Ct. at 2083.

Any reliance on Ford by Duclerc to counter the DOC Defendants' qualified immunity argument is misplaced.  In Ford, the district court (Dein, M.J.) held that a pretrial detainee (and later convicted prisoner), who incurred a DDU sanction during a previous period of incarceration, was entitled to a hearing prior to his detention in the DDU. Id. at 294–95.  First,

---

[9] After oral argument on the pending motions, Duclerc filed an additional reply directing the Court to consider Pletka v. Nix, 957 F.2d 1480 (8th Cir. 1992). Pl. Reply, D. 53 at 3.  This decision, however, lends further support to the conclusion that in the circumstances faced by Bender, he could not reasonably have understood that his conduct violated clearly established law.  In Pletka, an Iowa inmate was in disciplinary segregation, was transferred to Texas where he was released into the general population and then returned to Iowa where he was returned to disciplinary confinement without a new hearing under the rationale that he was required to serve the remainder of his sentence in disciplinary confinement.  957 F.2d at 1482. The Eight Circuit considered whether the inmate's Fourteenth Amendment due process rights were violated when he was returned to disciplinary confinement after being released to general population.  Id. at 1484–85.  The Eighth Circuit stated that for an inmate in administrative segregation, "[t]he passage of time . . . makes it entirely appropriate for circumstances to be carefully re-examined, and any changes in conditions assessed, before a prisoner who has been absent for a considerable period is returned to the special conditions of confinement to which he was subject when he left the sending state." Id. at 1483.  Duclerc relies on this statement in support of his position that "due process cannot be stale and must be updated and provided at times that are meaningful." Pl. Reply, D. 53 at 3.  However, the Eighth Circuit was making this observation in the context of making a distinction between an inmate being placed in administrative segregation, which carries "no punitive implications," and disciplinary confinement, in which inmates are placed "on account of past bad acts."  Pletka, 957 F.2d at 1482.  The Eight Circuit determined that in the context of an inmate who was serving time in disciplinary confinement "because of past rules infractions" and where "[a] hearing determining [the inmate's] guilt and punishment had already been held," "[t]here was nothing for a new hearing to address" and the inmate "simply had to serve out his time." Id. at 1483.

this opinion was not published until September 30, 2010, well after Bender placed Duclerc in the DDU in December 2009.  See Souza, 53 F.3d at 425 (noting that "the right must have been clearly established at the time of the defendants' alleged improper actions, and a court may not find that the right was established through the use of hindsight").  Accordingly, this ruling issued by the district court cannot constitute clearly established law at the time of the DOC Defendants' alleged actions as to Duclerc.  Second, on the limited issue that this Court decides in this case, this Court reaches the same conclusion that Ford court did where it held that the defendant there was entitled to qualified immunity regarding the plaintiff's placement in the DDU following his second conviction when he became a sentenced prisoner.  See Ford, 746 F. Supp. 2d at 298. Accordingly, the Court GRANTS the DOC Defendants' motion for summary judgment as they are entitled to qualified immunity on Duclerc's substantive and procedural due process claims.[10]

### D.    <u>Classification Claim</u>

Each of the parties has moved for summary judgment on Count V, which alleges that the DOC Defendants violated Mass. Gen. L. c. 127, § 20 and 103 C.M.R. § 420.08 when Duclerc was not classified at the beginning of his second period of incarceration.  The DOC Defendants contend that neither this statute nor the attendant regulation create a private right of action.  Defs. Mem., D. 36 at 27–28.  Duclerc responds that a violation of these provisions is "reviewable and enforceable" under the Massachusetts Declaratory Judgment Act, Mass. Gen L. c. 231A.  Pl. Opp., D. 41 at 14.  As discussed above, however, that statute, as a purely procedural law, does not apply in federal court.  See supra note 3.  Rather, the federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., governs here.  Moreover, the Declaratory Judgment Act "is not an

---

[10]Given this ruling, the Court need not address the DOC Defendants' arguments that there is no factual predicate for claims against St. Amand and Pepe, Defs. Mem., D. 36 at 32–33, and that the Prison Litigation Reform Act bars Duclerc's claims for mental or emotional distress damages. Id. at 28–30.

independent source of federal jurisdiction; the availability of such relief presupposes the existence of a judicially remediable right." Schilling v. Rogers, 363 U.S. 666, 677 (1960) (internal citation omitted). No such right exists here because there is no private cause of action under either Mass. Gen. L. c. 127, § 20 or 103 C.M.R. § 420.08.

Mass. Gen. L. c. 127, § 20 requires the commission to establish a "reception center for all male prisoners" and provides that "[a]ny male convict who is sentenced to any correctional institution of the commonwealth . . . be delivered . . . to [the reception center] for the purpose of proper classification of the prisoner." Where a plaintiff attempts to bring a private cause of action under a statute, the words of the statute must explicitly create a private cause of action, Borucki v. Ryan, 407 Mass. 1009, 1009 (1990), or there must be clear legislative intent to infer that a private cause of action exists. Loffredo v. Ctr. for Addictive Behaviors, 426 Mass. 541, 543 (1998). The words of Mass. Gen. L. c. 127, § 20 do not explicitly create a private cause of action. Duclerc also does not argue that the legislature intended to create a private cause of action for violations of this statute and at least one court has suggested that the legislature did not have such an intention. See Martino v. Hogan, 37 Mass. App. Ct. 710, 720 (1994) (noting that "[i]t is implausible to imagine that the Legislature, in granting the department authority to promulgate regulations, [such as Mass. Gen. L.] c. 127, §§ 20, 97, was empowering the department to create possible civil liability against the officials; implausible, too, to imagine that the writers of the departmental regulations were conscious of exercising any such delegated power").

Duclerc also attempts to bring a cause of action directly under 103 C.M.R. § 420.08, a DOC regulation that provides that "[u]pon commitment to the Department of Correction, each

inmate shall be admitted to a Reception Center or assigned by the Commissioner or designee to a facility where the inmate shall undergo an initial classification process."   However, the regulation does not create a private right of action.  See Loffredo, 426 Mass. at 546–47 (holding that there is no private cause of action under a prison regulation in the absence of clear legislative intent to create a private cause of action for a person injured by a regulation violation).  In fact, the regulation explicitly states that it is not "intended to confer any procedural or substantive rights or any private cause of action not otherwise granted by state or federal law." 103 C.M.R. § 420.01.   Accordingly, the Court GRANTS summary judgment to the DOC Defendants on Count V.

## VI.      Conclusion

For the foregoing reasons, the Court ALLOWS the dismissal of the DOC, see footnote 1, and GRANTS the DOC Defendants' motion for summary judgment and DENIES Duclerc's motion for partial summary judgment.

**So ordered.**

/s/ Denise J. Casper
United States District Judge